CHADWICK et al. v. FIVE HUNDRED AND SEVENTY-SIX GRANITE BLOCKS.

(District Court, E. D. New York. March 9, 1910.)

1. SHIPPING (§ 149*)—CONTRACT OF AFFREIGHTMENT—ASSUMPTION BY NEW OWNER OF VESSEL.

After the owners of a cargo which had been loaded on a vessel at a Maine port to be carried to New York had advanced money on the bill of lading signed by the master and the advance credited thereon, the vessel was sold in an admiralty suit. The new owners, without notice to or ne-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

gotiations with the cargo owners and without a new bill of lading being executed by the master, ordered the vessel to proceed with the cargo to New York, afterward presenting to the cargo owners a new bill of lading signed by themselves but not by the master, and having no credit thereon, which the cargo owners refused to accept. *Held*, that there was no implied contract of carriage in such case, but that the vessel owners in proceeding without further agreement to carry out the contract made by their predecessor were bound by its terms, which they knew, and were entitled to collect only the balance of freight due thereon.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 510; Dec. Dig. § 149.*]

2. SHIPPING (§ 118*)—FREIGHT—DEDUCTIONS.

An additional agreement, however, made by the cargo owners to pay a further sum from the freight when the cargo was discharged to a creditor of the former vessel owner, made for the purpose of securing the discharge of the vessel from the attachment but which did not accomplish that result, did not entitle the cargo owners to deduct such sum from the freight as against the new owners who performed the carriage; it not appearing that the agreement was one which the creditor could enforce under the circumstances.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 509; Dec. Dig. § 148.*]

In Admiralty. Suit by Cyrus W. Chadwick and Lizzie Chadwick, composing the firm of Chadwick & Co., against Five Hundred and Seventy-Six Granite Blocks. Decree for libelants for part of claim.

George H. Gilman, for libelants.

MacFarland, Taylor & Costello (E. G. Benedict, of counsel), for claimant.

CHATFIELD, District Judge. The steamer Oliver Ames was at the port of Vinal Haven, Me., in the month of August, 1909, for the purpose of bringing a cargo of 560 tons of granite paving blocks to New York. These paving blocks were the property of Joseph Leopold & Co. of New York, and had been loaded upon the vessel when she was libeled by a party named Snow for supplies. The captain of the vessel, upon communication with Leopold, obtained $250, advanced on account of freight, which was paid to Snow, and Leopold was asked to promise $175 more to Snow when the freight was finally paid. This was for the purpose of obtaining a release of the Snow claim and to free the vessel from the libel. The original bill of lading is dated August 18, 1909, and as signed by the master recites an advance on freight of $250. A duplicate of the bill of lading was transmitted to Leopold, and was the basis for his accepting the $250 draft which has been referred to. Subsequently other claims against the vessel were filed by intervening libelants, and upon the 28th day of August the vessel was sold to Chadwick & Co. and delivered by the marshal at noon on that day.

It may be assumed that from that point all maritime liens which had existed against the vessel and which were covered by the notice and publication in the action in which the vessel was sold were cut off and the vessel released therefrom. The former master of the vessel was re-employed by Chadwick & Co., and took charge as master for

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

them. On the morning of the 30th of August his preparations were complete, and he sailed for New York, going first to Portland, which he left at some time during that day. He at no time delivered or attempted to furnish to any one a new bill of lading, but sailed for New York, as it now appears, under instructions from Chadwick & Co. Upon the same day—that is, the 30th day of August—a representative of Chadwick & Co. called at the office of Leopold in New York, around 11 o'clock in the forenoon, and offered to them a bill of lading purporting to be "affirmed" by the master of the Ames, but actually signed "C. H. Chadwick & Co., per F. W. Hoerschgen," reciting that the schooner had on board 560 tons of granite paving blocks, to be delivered in good order at New York to Leopold & Co., at the rate of 85 cents per ton, with other conditions according to the original bill of lading, but with no statement or recognition of Leopold's advance to the master before the sale of the vessel. Leopold refused to accept such a bill of lading, telling the representative of Chadwick & Co. that they had their own bill of lading, and that they would stand on that and claim reimbursement for the freight advances, but demanding that the cargo be brought to New York and delivered also in accordance with the original contract. The result of these interviews between Chadwick and Leopold was that each party stood upon his rights, and no agreement was reached beyond the understanding that the vessel was to come to New York with the cargo. Upon her arrival at New York some days later, delay was caused by a dispute over the amount of these advances, and the libelant ultimately instituted this action to recover their freight and also to be reimbursed for the demurrage incident to the delay while the dispute was in progress, the cargo having finally been delivered to Leopold under stipulation.

So far as the question with respect to the bills of lading is concerned, the proposition is not complicated and the facts are undisputed. When Chadwick & Co. purchased the schooner, they purchased no rights over the cargo except that of possession. The cargo could have been placed on the dock or such other disposition of it could have been made as might be agreed upon between the owner of the cargo and the new owners of the vessel. We need not determine here whether the owners of the cargo or of the vessel could have compelled the United States marshal to remove the cargo and deliver the ship alone, thus making the expense of caring for the cargo a claim against the vessel prior to her sale free from liens; nor need we consider what remedy Leopold & Co. might have had if the new owners of the vessel had moved the vessel with the cargo on board, or threatened to dump it out in the most convenient and economical manner. The action of all the parties has relieved the court from now attempting to adjust their positions as they existed at that time. Leopold & Co. made no effort to claim their cargo, and interposed no objection to its being brought to New York so long as their title and rights were not interfered with. Chadwick & Co., the new owners, made the master of the vessel their agent, and put him in a position where under the statutes he was bound to furnish a bill of lading before sailing. In fact, the Harter

act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]) requires him, under penalty for failure so to do, to give a proper bill of lading, and that bill of lading had to be made out and accepted or rejected before the vessel undertook to perform an implied contract, contradictory, in effect, to the actual position of the parties at that time. No bill of lading made out by the agents and delivered, but not accepted, in New York, could take the place of the one which had to be made by the captain at the time of sailing; and it is now impossible to determine whether the motive that actuated the new owners of the vessel was a desire to avoid delay, or whether they wished the vessel to be brought to New York, or whether they thought they could earn the freight upon which the master of the vessel and their own agent knew that advances had already been made. The proper time for Chadwick & Co. to inform Leopold & Co. that advances to the captain on account of freight would not be respected and must be treated as liens discharged by the marshal's sale was when they attempted to establish new relations and to perform new services with respect to that cargo with the approval or knowledge of the persons who might have demanded the cargo at that point. An implied contract cannot be based upon an assumption that the parties would not have wanted to take the cargo from the vessel. The situation is not as if Chadwick & Co. were endeavoring to hold Leopold to a payment of freight upon certain articles of cargo against which Leopold & Co. were trying to set off some other claim against Chadwick & Co., but, on the contrary, the question is whether Chadwick & Co. preferred to undertake the freight contract in the condition in which it was at that time, namely, with a part of the freight already paid, or whether they wished to repudiate the contract and face the situation which then existed.

It is evident that they undertook the contract, that they preferred to bring the boat to New York for whatever they might be entitled to, and that they did not stop the boat from sailing when they learned that Leopold & Co. held a claim against the freight, or, if it might have been too late to stop the vessel by telegram at that time, the responsibility must be theirs for allowing the captain to start before they attempted to inform Leopold & Co. of the situation. This position of the parties is reasonably certain as to the $250. As to the further agreement on the part of Leopold & Co. to accept a draft for $175, but which draft has not been as yet accepted, a different question arises. As to this, the libelants have put in evidence a letter written by Capt. Morgan to Leopold & Co., upon the 18th day of August, 1909, which is as follows:

"Rockland, Me., Aug. 18, 1909.

"Mr. J. Leopold & Co. Dear Sir: Your telegram received to pay sight draft for $250 on freight on cargo of Schr. Oliver Ames for which we thank you very much. Now we want you to agree to pay to I. L. Snow & Co. $175 more on my arrival at your dock, and when said vessel is discharged. This is only paying the $175 freight money to Mr. Snow instead of paying it to me, now the vessel is all loaded ready to sail and this will release her and we will come right on as soon as we can, so please oblige

"Yours Very Truly,          N. W. Morgan, Master and Agent.

"P. S. Mr. Snow has already telegraphed the acceptance of this order."

What happened between the 18th of August and the 28th of August does not appear by the record, other than that the claim of I. L. Snow & Co. was not released, and that in the action brought thereon the schooner was sold to satisfy the claims proven against her. The letter above recited and the draft (Claimant's Exhibit B) paid in New York upon the 23d day of August show that Snow & Co. received on account the $250 forwarded. Capt. Morgan never delivered the cargo to Leopold & Co., as promised in his letter, nor was the condition ever fulfilled under which Snow & Co. could ask for payment of the $175 to them. The vessel was not released, and the freight money for the trip was not earned by the parties dealing with Snow.

Under these circumstances, the court is unable to hold that Snow (in the absence of testimony establishing a contract enforceable by him or performed on his part) can have more than he has already obtained from Leopold & Co., or that Leopold & Co. can deduct the $175 as well as the $250 from the agreed value of the freight earned by Chadwick & Co. The claimant has tendered the difference between $425 and the total amount of freight, and apparently takes the position that he can retain the $175 until he is compelled to turn it over to Snow, or that he may voluntarily give Snow the benefit of it, if Snow does not get the balance of his claim over $250 in the admiralty action in the district of Maine. But with this we have nothing to do. According to the holding above with respect to the $250, Chadwick & Co. are bound to allow Leopold & Co. whatever they knew or should have known was chargeable against the bill of lading which they assumed; and, if Snow & Co. can establish any further claim against the freight money, Chadwick & Co. must take care of this claim at the proper time. But this is far from deciding that any independent arrangement between Snow and Leopold, even perhaps made subsequently to the letter of August 18th, and hence not shown by this testimony or brought home to Chadwick & Co. at the time they purchased the schooner, must be paid by Chadwick & Co. out of their earnings for freight.

The libelant may recover the sum of $476, less $250.